# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MARY ANN BENDER,

     Plaintiff,

                                    **Case No. 1:23-cv-51**

   v.

                                    **JUDGE DOUGLAS R. COLE**

VILLAGE OF MARIEMONT, et al.,

     Defendants.

## OPINION AND ORDER

The Fourth Amendment to the United States Constitution prohibits the government from unreasonably interfering with property rights. Plaintiff Mary Ann Bender alleges that Defendants Nicholas Pittsley, Paul Rennie, Richard Hines, and the Village of Mariemont (the City Defendants) violated that guarantee by removing her from a property in which she had legal title as trustee. And she says that removal was based on nothing more than a trust beneficiary's unverified allegation that she lacked a possessory interest. The City Defendants contend that her constitutional claim fails as a matter of law. In their Motion for Summary Judgment (Doc. 35), they argue that Bender fails to identify any record facts that would: (1) overcome Defendants Pittsley's and Rennie's qualified immunity defense, and (2) allow a jury to find Defendant Hines or the municipality itself liable under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). (*See generally id.*). For the reasons described below, the Court disagrees with the former but agrees with the latter, and

accordingly **GRANTS IN PART** and **DENIES IN PART** the City Defendants'
Motion (Doc. 35).

## BACKGROUND[1]

Where there's a will, there's a way. But what if there are two competing wills,
and also a living-trust agreement, and a variety of affidavits to boot? Then things can
get messy. Here, Defendant Kevin Surette (a trust beneficiary and one of the
Defendants in this case) allegedly used at least one of those documents (no one can
recall exactly which one) to conscript a posse consisting of two Mariemont police
officials, Defendants Nicholas Pittsley and Paul Rennie (the Officers), in a quest to
remove the trustee, Plaintiff Mary Ann Bender, from residential property that the
trust owns for the benefit of others (including Surette). That removal, which is the
centerpiece of this lawsuit, did not go smoothly—but more on that later.

---

[1] In recounting a case's factual background on a motion for summary judgment, the Court
normally relies on the parties' stipulated undisputed facts, submitted as part of their briefing
as directed by Standing Order I.F.2, available at https://perma.cc/S2YS-S7ZP. There's a
wrinkle in that scheme here, since the City Defendants filed their motion before the case was
transferred to this Court—that is, before this Court's Standing Orders came to govern the
proceedings. Because of that, they didn't include a proposed list of stipulated undisputed
facts. Plaintiff laudably strove to make the best of a difficult situation by taking each sentence
of the Defendants' motion's factual-background section as though it were a proposed
undisputed fact and responding with admission or denial based on the record. (*See* Doc. 42-
1, #1255–65). Because the Court finds it fair to presume—and because the City Defendants
didn't discuss the matter further in their Reply, (Doc. 44)—that the City Defendants would
prefer to have their recounting of the facts treated as though it were undisputed, it treats
Bender's admissions to those facts as establishing a conclusive set of undisputed facts for the
purposes of resolving this motion. Where possible, the Court relies on that set of undisputed
facts. But given that set's sparsity, the Court will frequently resort to the record itself, and
clearly indicate when its discussion turns to disputed facts.

Before getting into the hotly disputed facts surrounding the incident at issue, it's helpful to understand the broader context in which they arose. Rita Cole[2] (who passed away in April of 2022) owned a condominium in Mariemont, Ohio, at 3809 Petoskey Avenue (the condo). (*See* Doc. 35, #925 (describing the "Mariemont condominium"); Doc. 42, #1238 (describing the "Condominium … located at 3809 Petoskey Avenue")). But Cole didn't reside there continuously. Starting from some unspecified date and continuing through 2017, she lived under a guardianship in a Rhode Island nursing home. (Doc. 42-1, #1256; *see also* Bender Depo., Doc. 27, #308). That arrangement worried Mary Ann Bender—who describes herself as Cole's "best friend for over 20 years." (Doc. 27, #306). Bender testified that she wasn't alone in her misgivings, and that Cole's sister asked her to intervene in the guardianship to safeguard Cole's wellbeing and prevent suspected abuse. (*Id.* at #308). So Bender did just that; specifically, she brought Cole home to Mariemont. (Doc. 42-1, #1256).

All agree that, upon Cole's return to Mariemont in 2017, Bender became Cole's caregiver. (*Id.*). But they dispute the precise nature of that relationship. Bender's testimony paints a picture of a tightly knit duo. She testified that she "move[d] into" the condo. (Doc. 27, #311). She and Cole would spend some days at Bender's own home, but they'd "always spen[d] the nights" at the condo. (*Id.*). The City Defendants paint a different picture, alleging that Mary Ann only "occasionally stay[ed] with Rita Cole during a period of caregiving." (Doc. 35, #925). They emphasize that Bender

---

[2] Just to avoid any confusion on the issue, Rita Cole is not related in any way to the undersigned.

actually "resides at 530 Terrace Avenue"—which is her own home. (Doc. 42-1, #1255). Bender admits that she "currently" lives there, but denies that she "has lived there continuously" since she purchased the property in 1996. (*Id.*). Particularly relevant here, she emphasizes that she "resided at" the condo while caring for Cole. (*Id.*). In brief, the parties agree that Bender cared for Cole in her final years, and that the two spent much of their time together. But they dispute the extent to which Bender resided with Cole at the condo—Bender says she resided there nightly, while the City Defendants allege that she stayed over only occasionally, maintaining her primary residence elsewhere.

Regardless of whose account better reflects the truth of Bender's watch over Cole's health, that role ended when the latter passed away on April 8, 2022. (*Id.* at #1257). At that point, two documents kicked in to govern the distribution of Cole's belongings: (1) the Rita M. Cole Living Trust Agreement and its amendments (the Trust), (Bender Decl., Doc. 41-11, #1163–78); and (2) the Last Will and Testament executed in 2021[3] (the 2021 Will), (*id.* at #1189–91). (Doc. 42-1, #1257). The latter makes no mention of either Bender, Surette, or the condo. (*See* Doc. 41-11, #1189–91). The former names Bender as successor trustee in case Rita's brother opted not to take the job. (Doc. 42-1, #1258). All agree that Bender ultimately received the office. (*Id.*). The Trust also names Surette as a trust beneficiary. (*Id.* at #1257). And by a

---

[3] The 2021 Will superseded an earlier will executed in 2015 (the 2015 Will), (Doc. 41-11 #1179–87), notable only because the 2015 Will named Defendant Kevin Surette as a beneficiary, while the 2021 Will did not. (*Compare* Doc. 41-11, #1180 (including Kevin Surette) *with id.* at #1189 (omitting Kevin Surette)).

later document, Cole guaranteed that ownership of the condo would vest in the Trust upon her death. (*See* Doc. 41-11, #1177).

Cole's estate plan set the stage for a tale as old as time: a feud over her assets. But this is no ordinary inheritance impasse, where one might encounter a long-lost cousin claiming to possess the authoritative will, a surprise bequest to a hotel concierge, or some other such thing. *See The Grand Budapest Hotel* (Fox Searchlight Pictures 2014). Instead, this spat arose when Surette (Cole's nephew and one of the Trust's beneficiaries) allegedly received a tip that Bender was mismanaging the condo in her capacity as trustee. (*See* Surette Depo., Doc. 33, #723). On the morning of May 6, 2022, Surette's cousins called him to report Bender's continued presence at the condo, where she was allegedly "taking property" and "destroying documents." (Doc. 33, #723, 748). After completing the call with his cousins, Surette decided to take action—he made his way to the Mariemont Police Department's offices. (*Id.* at #723).

That's where the story gets murky. The record reflects three distinct tellings: Surette's, Bender's, and the City Defendants' (which really boils down to the two City Defendants on the scene: Officers Pittsley and Renie). The Court will synthesize the three into one narrative, with care to emphasize where the accounts materially differ.

At the police station, Surette showed the police officers some kind of "estate document." (*See* Doc. 42, #1241; Doc. 42-1, #1260). But no one knows exactly *which* document. At his deposition, Surette couldn't match any of the estate documents described above to the one he says he took to the police station. (*See* Doc. 33, #702–

07). Neither could the Officers. (*See* Pittsley Depo., Doc. 31, #556 (Officer Pittsley testifying that Kevin presented "a [w]ill" without further detail; Rennie Depo., Doc. 32, #634 (Officer Rennie testifying the same)). It's also unclear what, exactly, Surette asked the Officers to do based on the mystery estate document. In Surette's own telling, his purpose was narrow: he only wanted the Officers to accompany him to the condo and keep the peace while he checked what Bender was up to. The City Defendants adopt that view in their motion. (*See* Doc. 35, #927 (citing Doc. 33, #723)). But the Officers' deposition testimony meaningfully differs from that account: they both testified that Surette asked for help *removing* Bender from the property, not just keeping the peace while Surette investigated the state of affairs. (Doc. 31, #561 (Officer Pittsley testifying that Surette "said [Bender] was living in his dead aunt's condo and … he wanted her out"); Doc. 32, #640 (Officer Rennie testifying the same)). That wrinkle tends to agree with Bender's description of Surette's mission: to evict her. (Doc. 42-1, #1264). Along those lines, too, it's at least clear what Surette's document *wasn't*: a court-issued eviction order. (*See* Doc. 33, #724 (Surette testifying that he "did not file any eviction" action)).

Whatever the details surrounding the troupe's origins and purpose, its three members made their way from the police station to the condo that same morning. (Doc. 42-1, #1261). Once there, the Officers positioned themselves at the condo's front door. (*Id.*). Surette knocked, then stood behind them. (*Id.*). Bender answered, (*id.*)— and that's where the parties' stories diverge once more. Bender testified that Surette declared that he "ha[d] the only true will," after which the trio muscled their way into

6

the condo. (*Id.* at #1261, 1264). She "asked the Officers why they were [there] on four separate occasions" and "demanded to see a warrant for their entry." (*Id.* at #1264–65). Defendants recall things differently. According to Surette, Bender "invit[ed] [him and the Officers] into the [condo's] foyer." (Doc. 33, #765). And while Officer Pittsley concedes that Bender didn't "formally invit[e]" them in, he testified that "the conversation" that started at the doorway "just kind of progressed into the condo" without protest from Bender. (Doc. 31, #582).

About an hour elapsed between when Surette and the Officers entered the condo and when they left. (Doc. 42-1, #1262). But only the final few minutes of that hour are relevant to this motion. The Officers both testify that they eventually tired of standing sentinel over the squabble between Surette and Bender and left, as they had "other runs and things to do." (Doc. 31, #595; *see also* Doc. 32, #654). Their last act before leaving was to issue a disorderly conduct citation to Bender for allegedly throwing a phone at Surette. (Doc. 32, #648–49). But, again, Bender tells a different story. Her narrative sounds less like a (relatively) uneventful departure and more like a forced removal. She testified that the Officers asked Surette "when did you want [Bender] out of here, Kevin? And Kevin said, [']today.[']" (Doc. 27, #379). Following that directive, Bender maintains the Officers "forced [Bender] from the residence" and "push[ed] [her] along" to leave within ten minutes (though Bender admits she couldn't recall whether she'd actually been touched by one of the Officers). (*Id.* at #383–85). One of the officers told her "at least ten times" that she was "going to jail." (*Id.* at #387). And that wasn't an empty threat—by the time Bender left the

7

condo, she'd been cited for disorderly conduct. (*Id.* at #393–94). Ultimately, the Officers "took the key" to the condo and "threw [Bender] out." (*Id.* at #407). So, crucially, under the City Defendants' version of events, they did nothing to interfere with Bender's physical presence in the condo, but Bender testifies to just the opposite. (*See* Doc. 42-1, #1262–63). Of course, which of those stories is true, if that matters, would be for a jury to decide.

Based on her version of the above events, Bender sued Surette, the Officers, Mariemont Chief of Police Richard Hines, and the Village of Mariemont. (Compl., Doc. 1). Only one of her Complaint's claims—brought under 42 U.S.C. § 1983 against only the City Defendants—is relevant here.[4] (Doc. 1, #5–6). That claim breaks down into two components, each applying to a different subset of the City Defendants. First, Bender alleges that the two Officers directly violated her Fourth Amendment rights by forcibly removing her from Cole's condo. (*See* Resp. to Mot. for Summ. J., Doc. 42, #1243–47). And second, she alleges that Chief Richard Hines (who was not there) and the Village itself violated her rights by failing to properly train the Officers or by ratifying their conduct. (*See id.* at #1247–53).

---

[4] Separate from her claim against the City Defendants, Bender also advances a state-law claim against Surette for trespass. (Doc. 1, #6). But Surette isn't moving for summary judgment here, so the Court need not address that claim.

Aside from the trespass claim, Bender's Complaint also separately requests declaratory judgment "finding that the [City Defendants] acted unlawfully." (Doc. 1, #7). That request, though styled as a third and separate "claim," is better understood as a prayer for a specific type of *relief* if her substantive claim under § 1983 succeeds. *See, e.g., Duncan v. Tennessee Valley Authority Retirement Sys.*, 123 F. Supp. 3d 972, 982 (M.D. Tenn. 2015) ("Declaratory judgment … is not a cause of action, but a specific type of relief."). Unlike the trespass claim, though, Bender's request for declaratory relief against the City Defendants is at issue here (because it relates to the § 1983 claim) and will be discussed below.

8

The City Defendants move for summary judgment on both components of the § 1983 claim. (Doc. 35). Their arguments are twofold. First, Officers Rennie and Pittsley claim they are entitled to qualified immunity for their actions at the condo. Second, Chief Richard Hines and the Village of Mariemont claim there is no record evidence on which a jury could hold them liable either for failing to train the Officers in proper eviction procedures or for ratifying the Officers' conduct. (*See generally id.*). Bender responded, (Doc. 42), and the City Defendants replied, (Doc. 45). So, the matter is now ripe for the Court's review.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that (1) there is no genuine dispute as to any material fact, and (2) they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The first part of the summary judgment standard focuses on the factual record: the movant bears the burden of pointing to specific evidence in the record to show the absence of a genuine dispute of material fact (or, if it is an issue on which the non-movant bears the burden at trial, the lack of any evidence that would allow the non-movant to meet that burden). *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The second part of the standard requires the movant to show that the facts (or lack of facts) identified at the first step entitles the movant to judgment as a matter of law. *See id.* at 323. In measuring the movant's arguments against that standard, "the Court must view the evidence in the light most favorable to the non-moving party." *Saint Vil v. Blue Ash Healthcare, LLC*, No. 1:23-cv-85, 2024 WL 3373312, at *3 (S.D. Ohio July 9, 2024) (citing *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). But if the movant carries its burden, then summary judgment is appropriate unless the nonmovant can "present some sufficient disagreement" through citations to facts in the record "that would warrant submitting the dispute to a jury." *Id.* (cleaned up).

Here's how that plays out in this case: because the non-movant (Plaintiff Mary Ann Bender) bears the burden of proving her claims at trial, the movants (the City Defendants) can prevail by showing that she lacks evidence to support an essential element of each claim on which they seek summary judgment. Still, the non-movant can take her case to a jury if she can point to evidence in the record sufficient to create a genuine dispute about whether she can support her claims. If the facts, viewed in the light most favorable to the non-movant, evince such a dispute, the Court must forward the dispute to a factfinder. But if not, the movant is entitled to summary judgment.

## LAW AND ANALYSIS

The City Defendants move for summary judgment on Bender's § 1983 claim. As noted, that claim subdivides into two parts, each applying to a different subset of the City Defendants: (1) the Officers' alleged direct violation of Bender's Fourth Amendment rights; and (2) Chief Hines' and the Village's potential liability predicated on either their failure to properly train the Officers or their ratification of the Officers' conduct. The Court addresses both in turn, as well as some of the City Defendants' other outlying arguments about available remedies.

A.    **The Evidence Reveals Genuine Issues of Material Fact Sufficient to Overcome the Officers' Qualified Immunity.**

The City Defendants argue that the Officers are entitled to qualified immunity as to Bender's § 1983 claim for violating her Fourth Amendment rights.[5] (Doc. 35, #63). "The affirmative defense of qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Cochran v. Gilliam*, 656 F.3d 300, 306 (6th Cir. 2011) (cleaned up). So the Court must determine whether the record exhibits a genuine issue of material fact as to (1) whether the Officers in fact violated her Fourth Amendment rights, and (2) whether those rights were "clearly established" such that any reasonable official in the Officers' position would've known that their conduct was unlawful. *Freeman v. Spoljaric*, 667 F.Supp.3d 636, 649 (S.D. Ohio 2023). The Court is free to address those two inquiries in either order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). But here the Court proceeds in the order listed above.

1.    **The Facts, Viewed in the Light Most Favorable to Bender, Show That the Officers Violated Her Fourth Amendment Rights.**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"

---

[5] Curiously, the City Defendants also insist that Bender failed to identify any "particular constitutional amendments … to support a federal cause of action." (Doc. 35, #933; Doc. 44, #1277–78). That can't be right. The very first filing in this case—Bender's Complaint—dedicates an entire paragraph to identifying a constitutional amendment underpinning the § 1983 claim. (Doc. 1, #5 (discussing, by name, the "Fourth Amendment of the United States Constitution")).

U.S. Const. amend. IV. That right erects two shields: one protects privacy interests, and the other property interests. *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 62–63 (1992) (citing *United States v. Jacobsen*, 466 U.S. 109, 113, 120 (1984)). Bender relies on the latter in her claim against the City Defendants in this case.[6] (*See* Doc. 1, #5–6 (raising allegations based on Bender's possessory interest in the condo)). Specifically, she claims that the City Defendants unreasonably seized "her" property (i.e., property in which she had a valid possessory interest). (*See id.* at #6).

The Fourth Amendment's protections against property seizure arise only "when there is some meaningful interference with an individual's possessory interests in that property." *Cochran*, 656 F.3d at 307 (quoting *Jacobsen*, 466 U.S. at 113). To rise to the level of a constitutional violation, the interference must be "unreasonable[]." *Soldal*, 506 U.S. at 71. In other words, the right doesn't protect any old property from any old interference. Rather, the property must be, in some sense, under the claimant's dominion. And, as described, the interference must be both meaningful and unreasonable. The Court addresses both of those requirements in turn.

---

[6] The City Defendants attempt to breach a Fourth Amendment shield Bender never raised: that which protects privacy, as opposed to property, interests. (Doc. 35, #938–39). But Bender never invokes the Fourth Amendment's privacy dimension. So the Court won't join the City Defendants in barking up the wrong tree; the Court instead focuses its analysis on the Fourth Amendment's property protections.

### a. As Trustee, Bender Was Vested With Legal Title Over the Condo, Bestowing on Her a Possessory Interest.

The Fourth Amendment guarantees the "right of the people to be secure in *their* … houses." U.S. Const. amend. IV (emphasis added). In other words, the Amendment's protections come into play only if Bender can show she had dominion over the condo. Stated differently, did she have the right to reside there?

Here, the answer to that question turns on Ohio trust law. Recall that Rita Cole conveyed the condo to the Trust upon her death. (Doc. 41-11, #1177–78). And even though that Trust named another person as trustee upon Rita's death, the parties all agree that the originally nominated individual's refusal to serve resulted in Bender assuming that role. (*See* Doc. 42-1, #1258). As a result, under Ohio trust law, Bender (as trustee) became vested with legal title to the condo (while the Trust beneficiaries retained beneficial title). *Gilman v. Hamilton Cnty. Bd. of Revision*, 937 N.E.2d 109, 114 (Ohio 2010) ("[U]nder a trust arrangement the legal and equitable estates are divided, [with] the legal title held by a trustee[.]").

But the parties dispute what possessory rights Bender's designation as trustee conferred upon her. Bender claims that, "by the explicit language of the Trust, [she] had the power to 'exercise all such rights and privileges as could be done, taken, or exercised by an owner of the Trust property.'" (Doc. 42, #1244 (quoting Doc. 41-11, #1166)). That power "inherently includes the ability to occupy" the property. (*Id.*). Though the City Defendants don't dispute the Trust language, they emphasize that Bender "was not a beneficiary to the trust, she was not a leaseholder, and she had her own [separate] residence." (Doc. 35, #935). Neither party's argument leads

13

inevitably to the conclusion that Bender did or didn't have a right to occupy the condo. Bender's legal claim that the Trust language "inherently" entitled her to occupy the condo is conclusory, while the City Defendants offer no legal support for their interpretation whatsoever, conclusory or otherwise.

Because neither party cites any legal authority to support its position, the Court resorts to trust law's first principles as to the scope of a trustee's rights over trust property. To start with, "[i]t is well established that so long as a trustee executes the trust in good faith … a court [] will not interfere with that discretion or undertake to substitute its discretion therefor." *Biddulph v. Delorenzo*, 2004-Ohio-4502 ¶ 27 (8th Dist.) (cleaned up). That is especially true where the trust instrument vests the trustee with broad powers, as it does here. *See id.* At that same time, broad trust language doesn't vest a trustee with unlimited license to do as she pleases with trust property. "[I]n addition to the instrument creating the trust, the authority of a trustee is limited by statutory and common law." *Id.* An Ohio court canvassing those limitations as applied to a similarly broad trust provision (one that allowed the trustee to transact trust property unilaterally and without judicial review) pointed to the Ohio Trust Code, Ohio Rev. Code §§ 5801–11. *See Alotech Ltd. L.L.C. v. Barnes*, 2017-Ohio-5569 ¶ 23 (8th Dist.). Among other things, that statute prohibits trustees from using trust property for their own benefit. *See* Ohio Rev. Code § 5808.02(A). Transactions of trust property sullied by the trustee's personal interests are "voidable by a beneficiary," subject to some carveouts. *Id.* § 5808.02(B). One of those is

14

potentially critical here: a self-interested transaction by a trustee is *not* voidable if it was "authorized by the terms of the trust." *Id.* § 5808.02(B)(1).

Summed up, Ohio law generally accepts as binding the terms of a trust agreement vesting the trustee with broad powers. But statutory and common-law requirements still limit the trustee's discretion in important ways. One statutory limitation prohibits self-dealing. But the same statutory provision imposing that limitation expressly exempts self-deals "authorized by the terms of the trust." *Id.* Stated differently, a trustee's statutory duties in cases of self-dealing are superseded by express trust terms authorizing such behavior—that is, the trust document's provisions reign supreme.

Here, Bender's residing in the condo after Cole's death could perhaps be understood as her undertaking an unwritten lease agreement with herself, serving as both lessor (in her capacity as trustee) and lessee (in her personal capacity). As a general matter, that would constitute self-dealing by a trustee. And that, in turn, may make her interest "voidable" under Ohio law. *Id.* § 5808.02(B).[7]

But that highlights a problem for Defendants' argument that Bender lacked a valid possessory interest. Namely, there is an important distinction between "void" and "voidable." When an interest is void, it is as though it never arose in the first

---

[7] That being said, the Trust document explicitly vested Bender with the power to "exercise all such rights and privileges as could be done, taken, or exercised by an owner of the Trust property." (Doc. 41-11, #1166). And the same statute that makes self-interested transactions voidable carves out any "transaction that was authorized by the terms of the trust." Ohio Rev. Code. § 5808.02(B)(1). So it's at least arguable that, as a threshold matter, the prohibition against self-dealing didn't even apply to Bender's self-lease. But in light of the discussion following this footnote, the Court need not reach that argument here.

instance. But when an interest is voidable, that means that, upon proper application, a court can void it. *See Cleveland Trust Co. v. Eaton*, 256 N.E.2d 198, 207–08 (Ohio 1970) (explaining that an instance of voidable self-dealing could only be set aside on application by a trust beneficiary, and that absent such an application, the transaction would stand). Here no such application was made. So even if Bender's conduct *wasn't* authorized by the Trust's terms, the trust beneficiaries' inaction left the condo as "hers," at least to the extent necessary to satisfy the Fourth Amendment's threshold requirement that it shields the right guaranteed to the people "to be secure in *their* … houses." U.S. Const. amend. IV (emphasis added).

### b. The Officers' Rousting of Bender From Her Property Unreasonably Interfered With Her Possessory Interest in the Condo.

Having established that the condo "belonged" to Bender in the constitutionally relevant sense, the question then becomes whether there remains a genuine dispute of material fact as to whether the Officers unreasonably seized the condo. Here, because the facts, taken in the light most favorable to Bender, would allow a jury to conclude that the Officers participated in the eviction and acted objectively unreasonably in doing so, the Court answers that question in the affirmative.

As the Supreme Court explains, "[a] 'seizure' of property … occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" *Soldal*, 506 U.S. at 61 (quoting *Jacobsen*, 466 U.S. at 113). That said, not all seizures offend the Constitution—to violate the Fourth Amendment, a seizure must be objectively unreasonable, and it must constitute state action. *See id.* at 61,

16

71 (citation omitted). That is, private evictions do not count for Fourth Amendment purposes. But unsurprisingly, "eviction[s] by the police" count as seizures. *Id.* at 69. So the question now before the Court is whether a reasonable jury could conclude that *this* eviction (1) constituted state action that (2) was "unreasonable" within the meaning of the Fourth Amendment.

Start with the state action inquiry. The Sixth Circuit has noted more than once that "a police officer's presence during a repossession solely to keep the peace … is alone insufficient to convert the repossession into state action." *Middaugh v. City of Three Rivers*, 684 F. App'x 522, 527 (6th Cir. 2017) (quoting *Hensley v. Gassman*, 693 F.3d 681, 689 (6th Cir. 2012)). But "[o]fficers 'cross the line' into state action when they 'take an active role in a seizure or eviction.'" *Id.* (quoting *Cochran*, 656 F.3d at 310). On Bender's telling, the Defendants crossed that line here. According to her, Officers Rennie and Pittsley: (1) asked Surette when he wanted Bender out of the condo; (2) "forced" her out when Surette answered "today"; (3) and threatened her "at least ten times" with jail time if she didn't comply. (Doc. 27, #379, 383–85, 387). In short, if jurors believe Bender's account, they could reasonably infer that this eviction counted as state action for Fourth Amendment purposes.

That leaves reasonableness. On that front, a Sixth Circuit case applying the reasonableness standard to similar—though far less plaintiff-friendly—facts is instructive. In *Cochran v. Gilliam*, the court faced a situation where two landlords, armed with a valid judgment of eviction, enlisted local police officers to keep the peace during the execution of that eviction. 656 F.3d at 302–05. The issue in that case

17

wasn't the plaintiff's dispossession from the premises—he'd been lawfully evicted by court order—but rather the dispossession of his personal property during the eviction. *Id.* at 306–07. Because the eviction judgment made no mention of the tenant's personal property, the Sixth Circuit held that it was "not reasonable for the [officers] to oversee and personally assist [in the seizure] when there was no apparent legal basis for such action." *Id.* at 309.

If the *Cochran* defendants' conduct was objectively unreasonable, so was the Officers' here, at least if, as Bender claims, they "threw [Bender] out of the condo" based solely on their own review of the trust materials. (Doc. 27, #407). Indeed, the *Cochran* defendants' actions were far *less* troublesome than Bender's account of the Officers' actions here, yet they still failed to pass constitutional muster. Those defendants were prompted to act by a facially valid judgment of eviction. In evaluating their authority to act under that judgment, they closely read its terms, noting that it didn't explicitly mention whether the tenant's personal property was subject to seizure. *Cochran*, 656 F.3d at 308. The Officers here made no such inquiry, admitting to giving Surette's purported "estate documents" at best a cursory review. (Doc. 31, #568–70; Doc. 32, #634). Moreover, the *Cochran* defendants took the further step of conferring with an attorney to confirm their authority to seize the tenant's personal property—and even that step wasn't enough to make their actions reasonable. *Cochran*, 656 F.3d at 308–09. Here, neither Officer made any further inquiry into the authority—or lack thereof—that Surette's documents conferred. (*See* Doc. 31, #568–70; Doc. 32, #634). So if the *Cochran* defendants' actions didn't pass

18

muster under the Fourth Amendment's "reasonableness" standard, the Officers' actions here, under Bender's version, do not either.

The City Defendants resist that conclusion by citing to inapposite caselaw. The bulk of their citations are to cases about Fourth Amendment guarantees not even implicated here: *Couzens v. City of Forest Park*, 114 F.4th 571 (6th Cir. 2024) (discussing seizure of the *person*, not of property); *Heien v. North Carolina*, 574 U.S. 54 (2014) (same); *Youkhanna v. Sterling Heights*, 934 F.3d 508 (6th Cir. 2019) (same). And in the one case they cite that talks about the right law, the most plaintiff-friendly reading of the facts (which is the only version that matters at summary judgment) showed that the government official simply "observe[d] and monitor[ed] a peaceful statutory repossession." *Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 995 (6th Cir. 1994). The most plaintiff-friendly reading of the facts in this case, by contrast, shows the opposite: that the Officers "threw [Bender] out of the condo." (Doc. 27, #407).

In sum, this Circuit's caselaw firmly classifies the Officers' conduct here—at least on Bender's telling of that conduct—as objectively unreasonable state action and therefore in violation of Bender's Fourth Amendment rights.[8]

---

[8] The Court takes care to note that the unreasonableness of the Officers' conduct arises from the facts of this case, not the nature of their actions. Indeed, officers routinely seize and remove persons from residences—for example, when they have probable cause to believe that the arrestee is criminally trespassing on the property. *See, e.g.*, *Weser v. Goodson*, 965 F.3d 507, 514 (6th Cir. 2020). Here, though, the *only* basis on which the Officers claimed the right to remove Bender was Kevin Surette's alleged estate document. And it is that specific basis for acting that the Court finds unreasonable in light of the binding caselaw discussed above.

    **2.**      **The Fourth Amendment Right at Issue Was Clearly Established.**

That a jury could find that the Officers violated Bender's Fourth Amendment rights is only half of the qualified-immunity analysis. The second half requires that the violated right to have been "clearly established" such that "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Only if the violated right's "contours" were "sufficiently clear" can a public official lose his qualified immunity. *Id.*

A right is clearly established "only when existing precedent has placed the … constitutional question beyond debate." *Wilson v. Gregory*, 3 F.4th 844, 855 (6th Cir. 2021) (cleaned up). Importantly, though, the inquiry "do[es] not require a case directly on point." *Id.* (cleaned up). It is enough if "the right's contours [are] sufficiently definite that any reasonable official … would have understood that he was violating it." *Id.* (cleaned up). But as the Supreme Court has cautioned, the right's "specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine … will apply to the factual situation" at hand. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). In determining whether a right fits that bill, the Court "look[s] first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within our circuit, and finally to decisions of other circuits." *Thomas v. Cohen*, 304 F.3d 563, 582 (6th Cir. 2002) (Gilman, J., concurring in part) (first modification in original).

Applied to the facts of this case—at least the facts taken in the light most favorable to Bender—the Sixth Circuit's caselaw puts the constitutional question

"beyond debate." *Wilson*, 3 F.4th at 855. First, *Cochran*—discussed extensively above—would put a reasonable official in the Officers' factual position on notice that, where a person's claim to have a right to evict someone from a residence rests exclusively on the purported effect of legal documents (the eviction judgment in *Cochran* or some as-yet-unidentified estate document here), the Officers must at least (1) closely read the document purporting to vest them with authority to seize the property at issue, and (2) enlist the aid of an attorney, at the very minimum, to confirm that their understanding of the document is correct. *Cochran*, 656 F.3d at 308–09. Indeed, that case would put a reasonable official on notice that even those two steps may not be enough, since the officials in that case took those steps and still lost their qualified immunity. *Id.*

To better understand what territory *Cochran* marks as clearly unconstitutional, it's helpful to take an example of what falls *outside* those bounds. In *Middaugh v. City of Three Rivers*, the Sixth Circuit held that police officers violated a car owner's Fourth Amendment rights by participating in the private repossession of their car without a supporting court order. 684 F. App'x at 529. But those officers were still entitled to qualified immunity because of the "daylight" between their conduct and the *Cochran* defendants' conduct. *Id.* at 530. On the state-action prong, for example, the *Middaugh* court noted that unlike the defendants in *Cochran*, who had "threatened to arrest the plaintiff," the *Middaugh* defendants hadn't. *Id.* No such daylight exists between *Cochran* and this case—viewed in the light most favorable to Bender, the record shows that the Officers threatened to arrest her if she didn't

comply with their orders. (Doc. 42-1, #1262). And in any case, the decision in *Middaugh* further expands the scope of "clearly unconstitutional conduct" such that that even the lesser degree of official participation that occurred in that case wouldn't be shielded by qualified immunity in cases going forward. And even more to the point here, on the reasonableness prong, the *Middaugh* court found it already clearly established that "police officers who take an active role in a seizure or eviction generally are not entitled to qualified immunity *when there is neither a specific court order permitting the officers' conduct nor any exigent circumstance.*" *Middaugh*, 684 F. App'x at 529 (quoting *Cochran*, 656 F.3d at 308) (cleaned up) (emphasis added). Taken together, *Cochran* and *Middaugh* establish a universe of clearly unconstitutional conduct that comfortably encompasses the Officers' actions here, at least on Bender's telling.

Does this mean that police officers can never act based on one person's account of ownership? Not necessarily. As *Middaugh* acknowledges, exigent circumstances may require exigent action. If a person yells, "Hey, he's stealing my car!," officers can rely on that to briefly seize the car to sort things out. *Cf. id.* But whatever the rule that might apply on those facts, no such exigency existed here.[9] Surrette simply

---

[9] A recent decision from the Sixth Circuit confirms—albeit in the context of the Fourteenth Amendment's guarantee of due process, which Bender hasn't raised—that holders of property interests have "a clearly established right to pre-eviction notice when exigent circumstances do not exist." *Fitzpatrick v. Hanney, et al.*, 138 F.4th 991, 997 (6th Cir. 2025). And the court also helpfully provided a definition of "exigent circumstances," as circumstances giving rise to "a special need for very prompt action to secure an important public interest." *Id.* (cleaned up). Meeting that standard, for example, were "the horrid condition[s] of [the plaintiff's] home" in that case. *Id.* at 998. But again, Defendants haven't pointed to any undisputed record evidence showing any exigency—i.e., any "special need for very prompt action"—at Bender's condo that day.

decided he wanted Bender out of the house, and (again, on Bender's telling) the Officers were only too happy to help in removing her without any meaningful investigation into the legal basis for doing so.

In sum, the City Defendants' motion for summary judgment fails with respect to the Officers because, under the most plaintiff-friendly reading of the record, they violated Bender's clearly established Fourth Amendment rights. True, at trial, a jury could reject Bender's account. And if, as the Officer's say, they did not remove Bender from the condo, that changes everything. But the Court cannot decide between those competing accounts at the summary judgment stage.

## B. The Evidence Doesn't Support Either a Failure-to-Train or a Ratification Theory of Municipal Liability Against Either Chief Hines or the City.

Apart from her claims against the Officers, Bender also sued the Village and Chief Hines, alleging that they (1) failed to adequately train the Officers as to the scope of their duties, and (2) ratified the Officers' unlawful actions. (Doc. 42, #1247–53). The claims against either Defendant proceed on different theories: against Hines under a theory of individual liability, and against the Village under a theory of municipal liability. Both fail.

### 1. The Evidence Doesn't Show That Chief Hines Was Sufficiently Involved in the Officers' Conduct to Be Held Individually Liable.

Bender asserts failure-to-train and ratification claims against Chief Hines in his individual capacity. (*See* Doc. 1, #2 (stating that "[Hines] is being sued in his individual capacity")). Generally, supervisory officials can't be held individually liable under § 1983 for their subordinates' actions—that is, "a § 1983 plaintiff generally

23

must prove that a defendant was *personally* at fault and that the defendant's culpable conduct (not somebody else's) *caused* the injury." *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 490 (6th Cir. 2020) (emphasis in original). Applying that principle to both the failure-to-train and ratification claims yields the same result: neither one merits consideration by a jury.

Start with the failure-to-train claim. "[A]bsent evidence of personal involvement in the alleged underlying misconduct, the defendant [cannot] be individually liable based on [his] failure to train or supervise." *Poynter v. Whitley Cnty. Det. Ctr.*, 722 F. Supp. 3d 745, 756 (E.D. Ky. 2024) (citing *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 646–48 (6th Cir. 2012)). Here, there is no evidence that Chief Hines was personally involved in any aspect of the Officers' underlying conduct. And, for what it's worth, Bender never argued in her Response that Chief Hines individually failed to train the Officers despite alleging as much in her Complaint, which suggests she has abandoned that argument. (*See* Doc. 42, #1248–51 (arguing that "the Village failed to train or supervise the Officers"); Doc. 1, #5).

Bender's argument that Chief Hines ratified the Officers' conduct by failing to investigate Bender's allegations doesn't fare any better. Even though an official's failure to investigate allegations of his subordinates' misconduct can amount to ratification sufficient to impose supervisory liability on the municipality itself (more on that later), that route is only available against a supervisor sued in his *official* capacity (i.e., when the claim is treated as one against the municipality). *See Wilson v. Russo*, No. 3:20-cv-2498, 2022 WL 911270, at *1 (N.D. Ohio Mar. 29, 2022)

(collecting cases) (explaining that "a policymaker cannot be liable in their individual capacity for failing to investigate"). Put simply, Bender's failure-to-train claim against Hines in his individual capacity fails because "the ratification theory does not apply to claims brought against a supervisor in their individual capacity." *Id.*; *see also Koren v. Neil*, No. 1:21-cv-9, 2022 WL 974340, at *11 (S.D. Ohio Mar. 31, 2022) (explaining that allegations of "mere ratification of conduct … [are] insufficient to make supervisors [individually] liable for their subordinates' conduct" (cleaned up)); *Enoch v. Hamilton Cnty. Sheriff's Off.*, No. 1:16-cv-661, 2017 WL 2210515, at *6–7 (S.D. Ohio May 18, 2017) (citing cases showing that ratification claims are viable only when brought against a state actor sued in their official capacity).

### 2. The Evidence Doesn't Support *Monell* Liability Against the Village.

Bender also pursued the failure-to-train and ratification claims against the Village itself under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)—that is, as § 1983 claims directed against a governmental entity as opposed to an individual official. (*See* Doc. 42, #1247–48). So the Court must determine whether the record in this case arguably shows "(1) a constitutional violation, which (2) was directly caused by a municipal policy or custom." *Abernathy v. City of Cincinnati*, No. 1:24-cv-162, 2024 WL 4955273, at *9–10 (S.D. Ohio Dec. 3, 2024) (discussing *Monell*, 436 U.S. at 658).

The question the first prong raises—did a constitutional violation occur?— moves past summary judgment based on the Court's earlier analysis of the claims against the Officers. The second prong—that the violation was "directly caused by a

25

municipal policy or custom"—can be satisfied if Bender can establish a genuine issue of material fact under of any of the following legal theories: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Abernathy*, 2024 WL 4955273, at *10 (cleaned up) (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)). Bender argues only the second and third prongs here. So the Court addresses each in turn. But spoiler alert—the Court concludes Bender fails on both.

> **a.    Bender's Ratification Theory Fails Because She Alleges Only a Single Failure to Investigate.**

*Monell* liability under a ratification theory requires a plaintiff to show that "an official with final decision-making authority ratified illegal actions." *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 270 (S.D. Ohio 2021). One way to show ratification is to demonstrate that the municipal entity "fail[ed] to meaningfully investigate and punish allegations of unconstitutional conduct." *Hill v. Wonch*, No. 2:19-cv-159, 2022 WL 22248554, at *2 (W.D. Mich. Apr. 5, 2022). That is the theory under which Bender seeks to hold the Village liable based on her allegation that "[d]espite [her] making a formal report, Chief Hines did not initiate an internal investigation." (Doc. 42, #1253). But the "allegation of a *single* failure to investigate a single plaintiff's claim does not suffice." *Pineda*, 977 F.3d at 495 (emphasis in original). Yet that is all that Bender alleges here. Because Bender doesn't allege "multiple earlier inadequate investigations," she can't sustain her *Monell* claims on a ratification theory. *Id.*

26

### b. Bender's Failure-to-Train Theory Against the Village Fails Because Mariemont Police Officers' Duties Don't Include Evictions.

To establish municipal liability on a failure-to-train theory, Bender must show three things: (1) that the Officers' training was "inadequate to prepare [them] for the tasks that officers in [their] position must perform;" (2) that the inadequacy resulted from the Village's "fail[ure] to train its employees to handle recurring situations presenting an obvious potential for such a violation;" and (3) that the inadequacy caused her injury. *Harvey v. Campbell Cnty., Tenn.*, 453 F. App'x 557, 562–63 (6th Cir. 2011).

Bender stumbles on the very first prong. Without a doubt, the evidence shows that the Officers weren't trained to perform evictions, let alone to recognize the potential constitutional pitfalls that can attend a botched eviction. (*See* Doc. 44, #1284 (recognizing that the Officers don't receive eviction training, since evictions are handled by the Sheriff's office)). But therein lies the rub: evictions aren't the sort of "tasks that officers in [their] position must perform." *Harvey*, 453 F. App'x at 562; *see also Buetenmiller v. Macomb Cnty.*, No. 20-11031, 2022 WL 203000, at *10 (E.D. Mich. Jan. 20, 2022) (explaining that allegations of official acts "far outside the scope" of duty can't support a failure-to-train theory of liability, since it wasn't plainly obvious to the municipal entity that its employees would commit such acts). Indeed, the Mariemont Police Department's Policy Manual expressly provides that "the Hamilton County Sheriff's Department handles evictions," (Doc. 44, #1284), and Officer Pittsley testified that the Mariemont Police Department doesn't perform evictions, (Doc. 31, #534).

Because *Monell* doesn't require municipal entities to train their employees on how to avoid constitutional pitfalls with respect to duties they are instructed not to perform, Bender can't succeed on a failure-to-train theory.

## C.    The City Defendants' Other Arguments Fail for Lack of Specificity.

The City Defendants wrap up their motion with two potshots, arguing that "punitive damages are not available here" and that Bender's "claim for declaratory judgment fails as a matter of law." (Doc. 35, #941–42 (capitalization omitted)). Those arguments consist of the following: three paragraphs of legal standards, and two paragraphs of plainly conclusory legal "arguments." (*See id.*). The best the City Defendants muster on the punitive-damages argument is that "[t]here is nothing in the record to support a claim for punitive damages." (*Id.* at #941). Similarly, with respect to declaratory judgment, "the factors do not weigh in favor of the Court exercising jurisdiction." (*Id.* at #942). Such vagueness is a far cry from the specific record citations required of a summary-judgment movant to demonstrate the absence of any genuine issue of material fact. To be sure, a party's obligation at summary judgment does not extend to citing record evidence to prove a lack of record evidence. But a party resting its entitlement to summary judgment on an argument that "no record evidence exists" must offer more than bald assertions to that effect. Rather, the party must explain *in what manner* the record evidence is lacking. Because movants have failed to explain their assertions, the Court declines to further consider these two alleged bases for summary judgment—to the minimal extent they can be so called.

## CONCLUSION

Because the evidence doesn't support Bender's claims for municipal liability under *Monell*, the Court **GRANTS IN PART** Defendants' Motion for Summary Judgment (Doc. 35), and **DISMISSES** Bender's claims to the extent that she seeks to recover against Chief Hines or the Village. But because a reasonable jury could conclude that the Officers violated Bender's clearly established Fourth Amendment rights, the Court **DENIES IN PART** the Motion (Doc. 35) to that extent.

**SO ORDERED.**

June 23, 2025
_____          _____
**DATE**                              **DOUGLAS R. COLE**
                                      **UNITED STATES DISTRICT JUDGE**

29